IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM LOVING, and<br>REBECCA LOVING,<br><br>    Plaintiffs,<br><br>    vs.<br><br>BOROUGH OF EAST MCKEESPORT,<br>and RICHARD MICHAELS, individually<br>and in his official capacity as an East<br>McKeesport police officer,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   2:02cv1727<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER OF COURT**

Presently before the Court for consideration and disposition is Defendants' MOTION FOR SUMMARY JUDGMENT (*Document No. 32*). The matter has been fully briefed. *See* Document Nos. 33, 38-39.

Background

Construed in the light most favorable to Plaintiffs, the record facts are as follows: Plaintiffs, William Loving ("Mr. Loving") and Rebecca Loving ("Ms. Loving") (collectively "Plaintiffs") are residents of the Borough of East McKeesport (the "Borough"). At the relevant time, Ms. Loving was a Pennsylvania State Trooper. Defendant Richard Michaels ("Chief Michaels") was the Chief of Police of the Borough. In March of 2000, Sherry Mitchell ("Mitchell"), Plaintiffs' neighbor, filed a complaint against Plaintiffs' children which alleged that they "constituted a 'gang' and were disturbing the peace." Complaint at ¶ 14. The complaint filed by Mitchell related to an incident which occurred on March 22, 2000.

In May of 2000, Plaintiffs' son received a citation for disorderly conduct from the Borough of East McKeesport Police Department for his involvement in the events of March 22, 2000. On July 18, 2000, that complaint was dismissed "due to the nonappearence of a witness." *Id.* at ¶ 19.

On July 25, 2000, Plaintiffs met with an Assistant District Attorney and completed a complaint form in which they alleged that Mitchell had reported false information to the police in her complaint. Def's Stmt. of Facts at ¶ 1.[1] On January 25, 2001, a hearing was held regarding Plaintiffs' complaint against Mitchell. *Id*. at ¶ 2. Plaintiffs, as well as Mitchell, Chief Michaels, and Officer Scott Lowden ("Officer Lowden") testified at the hearing. *Id*. at ¶ 3. During his testimony, Officer Lowden described what he had observed when he responded to the incident of March 22, 2000. *Id*. at ¶ 4. Ms. Loving subsequently told Chief Michaels that Officer Lowden's testimony was inconsistent with what he recorded in his police report, and she asked what the Chief was "going to do about it." *Id*. at ¶ 5. Chief Michaels advised Ms. Loving that she could file a complaint concerning her allegations against Officer Lowden. Def's Stmt. of Facts at ¶ 6. Plaintiffs' recollections of the specific alleged inconsistencies in Officer Lowden's testimony are rather vague and weak. *See id.* at ¶¶ 7-8.

In a subsequent letter to Mayor Robert Oskin ("Mayor Oskin"), Plaintiffs requested that Officer Lowden be investigated regarding his allegedly inconsistent testimony at the hearing. *Id*. at ¶ 10. On January 26, 2001, Mr. Loving met with Mayor Oskin concerning the subject of the letter. *Id*. at ¶ 11. Mayor Oskin also forwarded the letter to Chief Michaels, who contacted the District Attorney's Officer concerning Plaintiffs' complaint.[2] *Id*. at ¶¶ 12-13. On January 29, 2001, Chief Michaels informed Ms. Loving that he had turned the investigation of Officer

---

[1] Plaintiffs have not responded to Defendants' Statement of Undisputed Material Facts, contrary to the requirement of Local Rule 56.1.C.1. Therefore, pursuant to Local Rule 56.1.E, the facts set forth in Defendants' Statement of Undisputed Material Facts are deemed to be admitted for the purpose of the instant motion.

[2] Generally, when a citizen would complain to Chief Michaels about one of the Borough's police officers, Chief Michaels would provide a complaint form for the citizen to complete, then the Chief would investigate the complaint, or have an outside agency do so. Def's Stmt. of Facts at ¶ 14. Chief Michaels decided to use an outside agency, *i.e.*, the District Attorney's Office, to investigate Plaintiffs' complaint because it involved one of his officers, he wanted the investigation to be objective, and because Ms. Loving considered it to be a major complaint. *Id*. at ¶ 15.

Lowden over to the District Attorney's Office. Def's Stmt. of Facts at ¶ 17. Chief Michaels also explained the sum and substance of Plaintiffs' complaint to Mr. O'Leary, an investigator for the District Attorney's Office, and gave Mr. O'Leary all the information he had regarding that proceeding. *Id*. at ¶ 18. Mr. O'Leary conducted an investigation and found no misconduct by Officer Lowden. *Id*. at ¶ 22.

After having completed the investigation, and acting upon his own initiative, O'Leary contacted a lieutenant from the Pennsylvania State Police; the lieutenant subsequently contacted Chief Michaels. *Id*. at ¶¶ 24-25. Sergeant Heckman of the Pennsylvania State Police then spoke with Chief Michaels, in person, as a result of which conversation Chief Michaels filed a Bureau of Professional Responsibility ("BPR") complaint[3] against Ms. Loving based on her conduct toward the borough's police department. *Id*. at ¶ 26. Apparently Ms. Loving had threatened to contact the state Attorney General's Office regarding Officer Lowden's testimony even though the District Attorney's Office had found no misconduct by Officer Lowden. Def's Stmt. of Facts at ¶ 26. The BPR complaint lodged by Chief Michaels was also based on other incidents of allegedly harassing and threatening conduct by Plaintiffs. *See id.* at ¶ 27. When Chief Michaels filed the BPR complaint, Sergeant Heckman instructed the Chief to contact him if there were any

---

[3] A "BPR complaint" is a complaint concerning a state trooper or other employee of the Pennsylvania State Police which is filed by a person either within or outside of the Pennsylvania State Police. Def's Stmt of Facts at ¶ 29. BPR complaints are handled by the Bureau of Integrity and Professional Standards, formerly called the Bureau of Professional Responsibility (the "Bureau"). *Id*. at ¶ 30. All documents relating to BPR complaints are housed by the Bureau, except where a disciplinary action report or letter of suspension or dismissal results from a BPR complaint. *Id*. at ¶ 31. The Bureau is completely separate from the Pennsylvania State Police's Bureau of Human Resources, where the personnel files of state troopers are housed. *Id*. at ¶ 32. Additionally, Pennsylvania State Police policy specifically prohibits records of administrative investigation of alleged wrongdoing from being included in a state trooper's personnel file. *Id*. at ¶ 33. BPR files are kept confidential, with access to such files strictly limited to members of the Bureau. *Id*. at ¶ 34. Even a trooper's supervisor is not permitted to view the trooper's BPR files. *Id*. at ¶ 35. Finally, the individuals who supervise and evaluate state troopers and make decisions concerning their promotion are completely separate from the individuals who investigate BPR complaints. *Id*. at ¶ 36.

further problems with Ms. Loving. *Id*. at ¶ 28.

Ms. Loving learned of Chief Michaels' BPR complaint on April 26, 2001, when she was informed by Sergeant Heckman that he had received a copy of the letter that Plaintiffs had sent to Mayor Oskin. *Id*. at ¶ 37. Following the investigation of the BPR complaint, Captain Waters of the Bureau issued an adjudication in which he determined that Chief Michaels' complaint against Ms. Loving was "not sustained." *Id*. at ¶ 40. When a BPR complaint results in an adjudication of "not sustained," no discipline results, and none of the documents relating to the complaint is placed in the trooper's personnel file. Def's Stmt. of Facts at ¶ 41. Additionally, an adjudication of "not sustained" has no effect on the trooper's performance evaluations, or on consideration of the trooper for promotion. *Id*. at ¶ 42.

The animosity between the parties continued. On or about September 7, 2001, Plaintiffs posted a large, hand-painted sign in their front yard. *Id*. at ¶ 42. The sign read, "Good Morning, Chief," and was obviously directed toward Chief Michaels, who found the sign to be harassing. *Id*. at ¶¶ 42-43. On or about February 18, 2002, Plaintiffs sent a letter to the new mayor, Robert Howard, repeating their allegation that Officer Lowden testified falsely at the hearing. *Id*. at ¶ 44. Based on Sergeant Heckman's advice to contact him regarding any further problems, Chief Michaels informed the Bureau of the sign incident and Plaintiffs' letter to the new mayor. Def's Stmt. of Facts at ¶ 45. Although documents regarding these incidents were forwarded to the Pennsylvania State Police, no BPR or other complaint was filed. *Id*. at ¶ 46. Apparently at some point in all of this Plaintiffs notified the Borough of their intention to file a lawsuit. *See* Pltfs' Br. at 11.

The record reflects that Plaintiffs, and particularly Ms. Loving, have suffered no adverse professional consequences from this series of incidents. *See* Defs' Stmt. of Facts at ¶¶ 47-63, 72. For example, Ms. Loving received no discipline or other adverse action as a result of Chief Michaels' contact with her employer. *Id*. at ¶ 47. Her personnel file contains no reprimands or other disciplinary records, nor does said file contain any reference to the BPR complaint. *Id*. at

¶¶ 48-49. There is also no indication that the BPR complaint had any legally cognizable negative effect on her employment, or that any adverse action was taken against her as a result of said complaint. *Id*. at ¶ 49.

The record also reflects that as citizens of the Borough, Plaintiffs have suffered no legally cognizable adverse consequences from this series of incidents. *See id.* at ¶¶ 65-70. For example, Plaintiffs have no evidence that Chief Michaels or any other Borough official interfered with the investigation conducted by the District Attorney's Office. Def's Stmt. of Facts at ¶ 65. No one from the Borough has prevented Plaintiffs from attending a borough council meeting, and Plaintiffs have no evidence that anyone associated with the Borough has taken any steps to prevent them from doing so. *Id*. at ¶ 66. No one associated with the Borough has tried to prevent Plaintiffs from making a complaint against Officer Lowden. *Id.* at ¶ 68. Finally, Plaintiffs admit that their alleged fear that the police department or Borough council might not respond to a problem they report in the future is merely speculation. *Id*. at ¶ 70.

Plaintiffs filed this lawsuit against Defendants Borough of East McKeesport, Richard Michaels and Officer Lowden for alleged violations of the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("section 1983"), and Pennsylvania common law. Defendants filed a motion to dismiss. As a result of the disposition of said motion, the majority of Plaintiffs' claims, including all claims against Officer Lowden, were dismissed. *See* Document No. 10. At this stage of the proceeding only three claims remain: a First Amendment claim of retaliation against the Borough and Chief Michaels pursuant to 42 U.S.C. § 1983[4], a claim under 42 U.S.C. § 1983 against the Borough for

---

[4] The United States Supreme Court has noted that suits against a government employee in his official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985). The Supreme Court has instructed that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id*. at 166. Therefore, the Court's discussion of the claims against the Borough implicitly addresses any identical claim against Chief Michaels in his official capacity.

"failure to properly train, instruct and discipline police officers,"[5] and a state law claim for intentional interference with an employment relationship against Chief Michaels.[6] Defendants have moved for summary judgment on the remaining claims.

Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993).

---

[5] Complaint at ¶ 31.

[6] The Court previously ruled that the Pennsylvania Political Subdivision Tort Claims Act bars Plaintiffs' claim for intentional interference with an employment relationship against the Borough (and Chief Michaels in his official capacity), but does not bar this claim against Chief Michaels in his individual capacity. Document No. 10 at 21.

Discussion

A.   Claims Brought Pursuant to 42 U.S.C. § 1983

42 U.S.C. § 1983 does not contain any substantive rights, but, instead, it serves as a vehicle to enforce violations of underlying rights committed by state actors. *See, e.g., Elmore v. Cleary,* 399 F.3d 279, 281 (3d Cir. 2005). Generally speaking, a successful 1983 claim involves proof of the following three components: (1) state action, (2) causation and (3) a violation of an underlying substantive right. *See, e.g., id.* Thus, if there is no violation of a constitutional right, the claim cannot succeed.

Claims of retaliation under the First Amendment are divided into two categories: (1) claims alleging interference with a person's right of access to the courts and (2) claims alleging retaliation for activities protected under the First Amendment. *Grimm v. Borough of Norristown*, 226 F. Supp. 2d 606, 637 (E.D. Pa. 2002). "The rule in this Circuit appears to be that in cases alleging interference with a person's right of access to the courts, a plaintiff must allege that the defendant's actions chilled the exercise of this right, but that in cases alleging retaliation, a plaintiff need not allege that defendant's conduct had a chilling effect." *Id*. (citations omitted). Defendants assert that Plaintiffs lack sufficient evidence to maintain their claims of retaliation under either of these two theories. Defendants also contend that the Borough cannot be liable to Plaintiffs under a *respondeat superior* theory, that the Borough cannot be liable for having followed an unconstitutional policy, practice or custom regarding its alleged failure to train Chief Michaels (or other officers), and that Chief Michaels is entitled to qualified immunity. The Court will address each argument *seriatim*.

    1.   Interference with Access to the Courts

Defendants contend that "[b]ecause Plaintiffs have no evidence to support their claim that Defendants' alleged acts of retaliation chilled their speech, Defendants are entitled to summary judgment on Plaintiffs' First Amendment claim, to the extent that said claim is based on an

"access to the courts" theory." Def's Br. at 10. The Court agrees. The Court finds that there is not sufficient evidence that Defendants interfered with, threatened, or otherwise "chilled" Plaintiffs' exercise of their First Amendment right to petition the government for redress of their grievances, or their right to access the courts (or any other adjudicative body or proceeding). For example, Ms. Loving testified at her deposition that no one associated with the Borough tried to prevent Plaintiff from making their complaint against Officer Lowden. Rebecca Loving dep. at 46-47; *see generally* Def's br. at 9-10. Therefore, the Court will grant summary judgment as to this aspect of Plaintiffs' First Amendment claim.

### 2.  Other Alleged Retaliation for First Amendment Activities

Where a plaintiff does not allege interference with his or her access to the courts, First Amendment retaliation claims typically involve either a public employee's claim against his or her public employer, or a private citizen's claim against a public official and/or a government entity. *See Serena H. v. Kovarie*, 209 F. Supp. 2d 453, 457-58 (E.D. Pa. 2002). Despite the fact that Ms. Loving was, at the relevant time, a public employee, her claim clearly falls into the latter category because she does not allege that *her own* employer retaliated against her. *See, e.g., Eichenlaub v. Township of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004). To establish a claim that a public official retaliated against a private citizen in violation of the First Amendment, the citizen must establish that: (1) he or she engaged in conduct or speech protected by the First Amendment, (2) the public official took adverse action against the citizen(s), and (3) the adverse action was prompted or caused by the citizen's exercise of First Amendment rights. *Smith v. School Dist. of Philadelphia*, 112 F. Supp. 2d 417, 431 (E.D. Pa. 2000) (*citing Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). However, "[n]ot every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." *Suarez*, 202 F.3d at 685.

Plaintiffs contend that in response to 1) their complaints against Officer Lowden and 2)

having notified the Borough of their intention to file a lawsuit, Chief Michaels filed the BPR complaint and later contacted the Bureau regarding the sign incident and Plaintiffs' letter to the new mayor.  *See* Pltfs' Br. at 11.  Defendant, on the other hand, contend that Chief Michaels' conduct "was, in and of itself, protected speech and/or not actionable in the context of a claim for retaliation under the First Amendment."  Defs' Br. at 8.  Defendants rely upon *McLaughlin v. Watson*, 271 F.3d 566 (3d Cir. 2001), where the United States Court of Appeals for the Third Circuit provided the following guidance:

> When a public official is sued for allegedly causing a third party to take some type of adverse action against plaintiff's speech, we have held that defendant's conduct must be of a particularly virulent character.  It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action.  **Rather, defendant must "threaten" or "coerce" the third party to act.**  Along these lines [Defendant's] Brief aptly directs us to our sister circuit's opinion in *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676 (4th Cir.2000):
>> The nature of the [defendant's] retaliatory acts has particular significance where the public official's acts are in the form of speech. Not only is there an interest in having public officials fulfill their duties, a public official's own First Amendment speech rights are implicated.  Thus, where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow, such speech does not adversely affect a citizen's First Amendment rights even if defamatory.

*McLaughlin*, 271 F.3d at 573 (*quoting Suarez*, 202 F.3d at 687) (emphasis added).

The Court finds that there is not sufficient evidence for a reasonable fact finder to conclude that Chief Michaels threatened or coerced anyone in the Pennsylvania State Police, or anyone else, to take any adverse action against Plaintiffs.  Accordingly, the Court will grant summary judgment as to this aspect of Plaintiffs' First Amendment claim.

### 3. No Liability Under a *Respondeat Superior* Theory

Defendants contend that under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and other Supreme Court precedents, the Borough it is entitled to summary judgment on Plaintiffs' First Amendment claims.  Defs' Br. at 12-13.  It is undisputed that under *Monell*, a

governmental agency is not liable under § 1983 for the actions of individual employees under *respondeat superior*. Therefore, the Borough is entitled to summary judgment to the extent that Plaintiffs seek to recover from the Borough for alleged First Amendment violations committed by Chief Michaels.

    4.    <u>Insufficient Evidence to Support a Claim for Failure to Train</u>

The Complaint alleges, in relevant part, as follows:

> The actions of Defendant Michaels in releasing the information contained in the letter written by Mr. Loving to Mrs. Loving's employer were done pursuant to the policy, practice or custom of the Defendant East McKeesport Borough, which permitted, condoned and encouraged the release of information which was clearly confidential and private.
> As further evidence of said policy, Defendant East Mckeesport Borough has intentionally, willfully or negligently failed to properly train, instruct and discipline police officers and other employees, including but not limited to the following:
>     a.    failure to properly train and instruct police officers and other employees in the rights of persons, including plaintiffs, and the protection of confidential information;
>     b.    failure to adequately investigate allegations of improper police and other employees' conduct;
>     c.    failure to discipline, prosecute or remove police officers and other employees who exceed their authority and violate the rights of persons, including plaintiffs;

Complaint at ¶¶ 30-31.

Defendants contend that the Borough it is entitled to summary judgment on Plaintiffs' claim of failure to train because "no reasonable fact finder could conclude that the alleged inadequacy in the Borough's training is 'so obvious' and 'so likely to result in the violation of constitutional rights' that the Borough was 'deliberately indifferent' to the rights of Plaintiffs." Defs' Br. at 15-16 (*citing City of Canton v. Harris*, 489 U.S. 378, 388, 390 (1989)).

Although there is no *respondeat superior* liability under section 1983, "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. As the Third Circuit noted recently, "[t]his typically requires proof of a

pattern of underlying constitutional violations." *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004) (citing *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000)). Furthermore, "[a]lthough it is possible, proving deliberate indifference in the absence of such a pattern is a difficult task." *Carswell*, 381 F.3d at 244.

Plaintiffs' claim against the Borough for failure to train cannot survive summary judgment. There is not sufficient record evidence that the Borough 1) failed to properly train Chief Michaels, or any other member of the East McKeesport police force, 2) had a policy or custom which caused the alleged violations of Plaintiffs' First Amendment rights, 3) exhibited deliberate indifference to the rights of persons with whom the police force comes into contact, or 4) had a pattern of underlying constitutional violations. Therefore, the Court finds and rules that the Borough is entitled to summary judgment on Plaintiffs' claim of failure to train.

5.  <u>Chief Michaels is Entitled to Qualified Immunity</u>

In *Wright v. City of Philadelphia*, 409 F.3d 595 (3d Cir. 2005) , the United States Court of Appeals for the Third Circuit provided the following discussion of section 1983 claims and the privilege of qualified immunity:

> Section 1983 provides a cause of action against any person who, acting under color of state law, deprives another of his or her federal rights. When an officer's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit. The primary purpose of affording public officials the privilege of qualified immunity, thus insulating them from suit, is to protect them from undue interference with their duties and from potentially disabling threats of liability. The privilege of qualified immunity, however, can be overcome when state officials violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Wright*, 409 F.3d at 599 (citations and quotations omitted). The analysis for determining whether qualified immunity applies was explained by the United States Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001):

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. ... If no constitutional right would have

11

been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

*Saucier*, 533 U.S. at 201. In *Wright* the Third Circuit interpreted *Saucier* and the Supreme Court's subsequent opinion in *Brosseau v. Haugen*, 543 U.S. 194 (2004) to establish "a two-step qualified immunity inquiry, with the first step being the 'constitutional issue' and the second step being 'whether the right was clearly established.'" *Wright*, 409 F.3d at 601. Finally, in the Third Circuit "qualified immunity is an objective question to be decided by the Court as a matter of law." *Carswell*, 381 F.3d at 242 (*citing Doe v. Groody*, 361 F.3d 232, 238 (3d Cir. 2004)).

At the first step of the analysis, viewing the facts in the light most favorable to Plaintiffs, the facts do not establish that Chief Michaels' conduct violated Plaintiffs' constitutional rights under any of the theories that they have advanced in this lawsuit. Therefore, the Court finds that Chief Michaels is entitled to qualified immunity, and "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

B.  <u>Intentional Interference with an Employment/ Contractual Relationship</u>

Count III of Plaintiffs' Complaint asserts that "Defendant Michaels intentionally interfered in an employment relationship by complaining against Plaintiff Rebecca Loving to her employer...." Complaint at ¶ 38. Pennsylvania recognizes the tort of intentional interference with an employment and/or contractual relationship. *Curran v. Children's Service Center of Wyoming County, Inc.*, 578 A.2d 8 (Pa. Super. 1990), *appeal denied*, 585 A.2d 468 (1991). To establish a *prima facie* case for intentional interference with an employment relationship Plaintiffs are required to prove four things:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

12

*Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997) (citation omitted).

Defendants argue that Plaintiffs fail to establish a *prima facie* claim of intentional interference with an employment relationship because there is no evidence that Ms. Loving suffered any legal or actual damages. Pltf's Br. at 5. The deposition testimony of Ms. Loving clearly reflects that she "was subject to no discipline or any other adverse action as a result of Chief Michaels' contact with her employer." *Id*.; *see also* Rebecca Loving dep. at 173, 175, 195 & 216. Therefore, the Court finds that there is not sufficient evidence to establish the fourth element of a *prima facie* case of intentional interference with an employment and/or contractual relationship.[7] Accordingly, summary judgment will be granted as to this claim.

### Conclusion

For the reasons hereinabove set forth, the Court will grant Defendants' Motion for Summary Judgment. An appropriate Order follows.

McVerry, J.

---

[7] The Court has fully considered the arguments made by Plaintiffs in opposition to summary judgment as to this claim. *See* Pltf's Br. in Opp. at 6-10. In the view of the Court the circumstances surrounding the BPR complaint are not sufficient to establish that Plaintiffs suffered any legally cognizable damages as a result of Defendants' conduct.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM LOVING, and <br> REBECCA LOVING, <br><br> Plaintiffs, <br><br> vs. <br><br> BOROUGH OF EAST MCKEESPORT, <br> and RICHARD MICHAELS, individually <br> and in his official capacity as an East <br> McKeesport police officer, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )  2:02cv1727 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**ORDER OF COURT**

AND NOW, this 29th day of December, 2005, in accordance with the foregoing Memorandum Opinion it is hereby ORDERED, ADJUDGED and DECREED that Defendants' Motion for Summary Judgment is **GRANTED** and judgment shall be entered in favor of Defendants. The Clerk shall docket this case as closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:   Phyllis A. Jin, Esquire
      Law Offices of Phyllis A. Jin
      50 East Main Street
      Blackstone Building, 2nd Floor
      Uniontown, PA 15401

      Thomas P. McGinnis, Esquire
      Email: tmcginnis@tthlaw.com